# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WESTERN VALUES PROJECT**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> Defendant. | Case No. 17-cv-1671 (CRC) |

## MEMORANDUM OPINION

Signed into law by Theodore Roosevelt, the Antiquities Act of 1906 gives presidents the power to designate landmarks located on federal land as "national monuments." Presidents in the years since have designated 129 national monuments—among them iconic destinations like the Statue of Liberty—covering over 800 million acres of federal land. See Antiquities Act: Monuments List, Nat'l Park Serv., https://perma.cc/5GJR-UK2J (last visited July 18, 2018).

Early into his tenure, President Trump made clear that he believed some of his recent predecessors had overreached their statutory authority to make designations. He ordered his Interior Department to review all monuments established after 1996 and has since dramatically reduced the size of two such monuments. The plaintiff in this case, Western Values Project, is a conservation group that wants to know more about the President's conception of his power to shrink and abolish national monuments. The group filed two requests under the Freedom of Information Act seeking records from the Department of Justice. The requests sought records about the Department's prior legal opinions regarding the scope of that power—specifically, whether there had been any efforts to revisit, revoke, or amend those opinions in the first year of Trump's presidency. As to the bulk of Western Values' request, the Department issued a "*Glomar* response"—it refused to confirm or deny the existence of any records. As to the

remaining portion, the Department informed Western Values that it had found no responsive records.

On the parties' motions for summary judgment, the Court concludes that the Department was not permitted to issue a *Glomar* response, but that its search as to the final portion of Western Values' request was adequate.

**I.	Background**

The Antiquities Act of 1906, 54 U.S.C. § 320301, gives the President discretionary power to proclaim "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" located on federal land as "national monuments." As relevant here, the Department of Justice has twice weighed in on the scope of the President's power under the Act. In the 1930s, the Attorney General opined that the President lacks authority to revoke a predecessor's monument designation. See 39 Op. Att'y Gen. 185 (1938). A more recent opinion authored by the Department's Office of Legal Counsel ("OLC") concluded that the Act allowed the President to establish certain monuments in the oceans—outside of the nation's borders—in order to protect domestic marine resources. See 24 Op. O.L.C. 183 (2000).

Last year, the American Enterprise Institute published a report asserting that those legal opinions had incorrectly interpreted the Antiquities Act. See John Yoo & Todd Gaziano, Am. Enterprise Inst., Presidential Authority to Revoke or Reduce National Monument Designations 5, 13 (2017), https://perma.cc/XKH4-L9J4. The report was co-authored by John Yoo, the former head of OLC, and Todd Gaziano, an attorney involved in lawsuits seeking to reduce the size of several monuments designated by prior presidents. Id. at 20. The release of this report, along with the ongoing "controversy over certain national monument designations" by prior

2

presidents,[1] led Western Values to believe that the Trump administration did not view the 1938 and 2000 opinions as binding. Pl.'s Opp'n Summ. J. at 3

In May 2017, Western Values submitted two FOIA requests to the Department of Justice seeking four categories of records dating back to January 20, 2017—the day President Trump took office. Specifically, Western Values sought:

- records "that mention, describe, refer to, or relate to a request or effort to revisit[,] rescind, amend, or revoke the 2000 OLC opinion titled *Administration of Coral Reef Resources in the Northwest Hawaiian Islands* dated September 15, 2000";

- records that "contain, mention, describe, refer to, or relate to a request or effort to revisit[,] rescind, amend, or revoke the 1938 Attorney General Opinion titled *Proposed Abolishment of Castle Pinckney National Monument*, 39 Op. Att'y Gen. 185 (1938)";

- records that "discuss, summarize, or analyze, or include/included as an attachment the American Enterprise Institute's report entitled, 'Presidential Authority to Revoke or Reduce National Monument Designations,' by John Yoo and Todd Gaziano, dated March 2017"; and

- records of communications between (a) OLC and (b) John Yoo, Todd Gaziano, Pacific Legal Foundations staff, or American Enterprise Institute staff.

Decl. of Paul P. Coborn Supp. Def.'s Mot. Summ. J. ("Colborn Decl. I") Exs. A, B.

The Department issued a so-called "*Glomar* response"—one refusing to confirm or deny the existence of records—as to all but the fourth category of requested records. Id. Ex. D. As to

---

[1] President Barack Obama designated 34 national monuments during his tenure—the greatest number in presidential history—and made five of these designations in the week before leaving office. Juliet Eilperin & Brady Dennis, Obama Names Five New National Monuments, including Southern Civil Rights Sites, Wash. Post (Jan. 12, 2017), https://perma.cc/KW7V-2XFY. A few months after taking office, President Trump ordered the Secretary of the Interior to review the legality of national monuments designated since 1996. Following that review, in December 2017, President Trump issued proclamations sharply reducing the size of two national monuments in Utah. See 82 F.R. 58081–86, 58089–95. Bears Ears, designated by President Obama in 2016, is now 15% of its original area. Grand Staircase-Escalante, designated by President Clinton in 1996, is about half its former size.

that final category, the Department conducted a search and informed Western Values that no responsive records existed. Id. In August 2017, Western Values filed this suit challenging the Department's *Glomar* response and contesting the adequacy of OLC's search for the final category of requested records. The parties have now moved for summary judgment on those issues.

**II.     Standard of Review**

FOIA requires federal executive agencies to produce their records upon request unless one of the Act's nine exemptions applies. See 5 U.S.C. § 552(b). The exemptions aim "to balance the public's interest in governmental transparency against the 'legitimate governmental and private interests [that] could be harmed by release of certain types of information.'" United Techs. Corp. v. DOD, 601 F.3d 557 (D.C. Cir. 2010) (quoting Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992)). "But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976).

Disputes about whether documents may be withheld under FOIA exemption are generally resolved on cross-motions for summary judgment. The government at summary judgment may rely on "agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" Electronic Privacy Info. Ctr. v. NSA, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting Gardels v. CIA, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).

### III. Analysis

    A. <u>The Department's *Glomar* Response Was Improper</u>

Western Values contends that the Department was not permitted to issue a *Glomar* response as to the first three categories of requested documents—those related to the two legal opinions and the American Enterprise Institute report. The Court agrees.

Generally, an agency responding to a FOIA request "must acknowledge the existence of information responsive to [that] request and provide specific, non-conclusory justifications for withholding that information" under one of FOIA's exemptions. <u>Roth v. DOJ</u>, 642 F.3d 1161, 1178 (D.C. Cir. 2011). So-called "*Glomar* responses"—named for a ship used in a secret operation to recover a sunken Soviet submarine—"are an exception to [that] general rule." <u>Id.</u> A *Glomar* response is one that refuses to disclose the existence or nonexistence of responsive records. An agency may issue one only "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." <u>Wolf v. CIA</u>, 473 F.3d 370, 374 (D.C. Cir. 2007).

Here, the Department contends that the existence or nonexistence of records sought by Western Values falls within Exemption 5. That exemption protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Or, put more simply, Exemption 5 shields information covered by "traditional privileges that the Government could assert in civil litigation against a private litigant." <u>Loving v. Dep't of Defense</u>, 550 F.3d 32, 37 (D.C. Cir. 2008).

The Department invokes three of those privileges here: the attorney-client privilege, the presidential communications privilege, and the deliberative process privilege. It contends that the existence or nonexistence of the sought records is *itself* subject to these privileges.

5

Before explaining why that is not so, the Court notes upfront that the Department's assertion of a *Glomar* response here is unusual. There is no case ruling on—let alone approving—a *Glomar* response relying on Exemption 5. Indeed, the government cites only one case in which the government even *asserted* such a response. See Judicial Watch, Inc. v. DOJ, 898 F. Supp. 2d 93, 106 n.10 (D.D.C. 2012) (noting that the Court need not address whether the *Glomar* response was appropriate under Exemption 5). The absence of authority alone does not doom the Department's argument. But it is a striking absence given the frequency of requests for records (and subsequent litigation) about OLC's legal opinions. If disclosing the mere existence of OLC's and other agencies' legal opinions is harmful, then why does the Department so frequently issue standard FOIA responses identifying responsive documents? See, e.g., Judicial Watch, Inc. v. DOJ, 20 F. Supp. 3d 260, 264 (D.D.C. 2014) (acknowledging existence of records responsive to request for all OLC records related to a decision by the Department of Homeland Security); Nat'l Sec. Counselors v. CIA, 960 F. Supp. 2d 101, 119–20 (D.D.C. 2013) (same as to request for all OLC opinions concerning record retention statutes).

The Department admits that it does not typically issue *Glomar* responses pursuant to Exemption 5. But it points to several features of Western Values' FOIA requests that, in the Department's view, distinguish them from the norm—and in a way that warrants invoking *Glomar*. As explained by an OLC affiant, the requests for information regarding the Department's legal opinions "are highly specific"—they go to "whether OLC has been asked to answer a particular legal question" (whether to revisit prior opinions) "by one of only a very few possible clients" (the three agencies who received the 1938 or 2000 opinion[2]) and "within a very

---

[2] Specifically, the Department claims that its "few possible clients" are the Department of Interior (as the recipient of the 1938 and 2000 opinions) or the National Oceanic and

6

narrow timeframe" (the eleven-month span between President Trump's inauguration and the Department's response). Colborn Decl. I ¶ 13, 15. The Department makes a similar argument with respect to Western Values' request for communications discussing the American Enterprise Institute report: that, given the report's criticism of the 1938 and 2000 opinions, the existence or nonexistence of records "would reveal whether OLC or its clients had considered reexamining and/or reconsidering either of the two identified opinions." Id. ¶ 17.

The Department contends that, in light of this specificity, the existence or nonexistence of the requested records would reveal information protected by its three asserted privileges. The Court disagrees. Taking the three privileges in turn:

*1.* The attorney-client privilege protects communications between an attorney and his client that relate to legal advice sought by the client and are "based on confidential information provided by the client." Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 254 (D.C. Cir. 1977). OLC often acts as an attorney to other executive-branch agencies, and thus the content of its legal opinions submitted to those agencies are often covered by attorney-client privilege. Here, however, OLC wants to withhold not only the content of any legal advice it may have provided, but also the very fact of whether it possesses records responsive to Western Values' requests. That blanket withholding is therefore justified only if confirming the existence or nonexistence of records responsive to Western Values' requests would in effect unveil a *communication* between OLC and a particular agency client related to legal advice sought by that client and based on confidential information it provided to OLC.

---

Atmospheric Administration or Council for Environmental Quality (as the recipients of the 2000 opinion).

It would not. The *nonexistence* of a responsive record would reveal no such communication: the fact that a client never requested advice about an issue does not expose anything remotely approaching a protected attorney-client communication. And even acknowledging the *existence* of a record within the parameters of Western Values' request would not necessarily reveal any protected information. For one, contrary to the Department's argument, the requests were not actually limited to a narrow set of agency clients. Their terms cover *any* communications about efforts to revisit the 1938 and 2000 opinions. Colborn Decl. I Exs. A, B. Thus, the request could readily capture OLC's internal discussion about the opinions, which clearly would have no claim to attorney-client privilege. And even if the request were in fact limited to a narrow set of clients, the mere existence of a communication between OLC and *some unspecified agency* about efforts to revisit an old OLC opinion is not privileged. (By the Department's logic, the fact that an attorney consulted with one of his many clients about a certain issue would be privileged. That is simply not the case.). Moreover, without more particularized information about any responsive communications, there is no way to know whether they were based on confidential information provided by the agency client. See In re Lindsey, 148 F.3d 1100, 1106 (D.C. Cir. 1998) ("A blanket assertion of the privilege will not suffice. Rather, the proponent must conclusively prove each element of the privilege." (internal quotation omitted)).

If the Department is concerned that acknowledging the fact of a communication between it and a particular client regarding a particular subject area would effectively disclose a confidential communication, then the proper course would be to claim that redaction of the client's identity is necessary under Exemption 5. The agency cannot wholesale decline to acknowledge whether responsive records exist.

8

*2.* Nor does the existence or nonexistence of records implicate the presidential communications privilege. That privilege covers materials only if they were "authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." In re Sealed Case, 121 F.3d 729, 752 (D.C. Cir. 1997). There is no reason to believe that the very fact of whether responsive records exist would reveal the content of a communication made to or from an immediate White House staffer. At most, that fact might reveal something about the executive branch's view of presidential power under the Antiquities Act, or about how the President arrived at any decisions related to national monuments. But the privilege is not so broad as to cover information that merely sheds light on presidential decision-making.

*3.* Finally, the Department cannot rely on the deliberative process privilege to justify its *Glomar* response. That privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) (internal quotation omitted). To warrant protection, a communication must "reflect[] the give-and-take of the consultative process." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). The existence of a responsive record here would show only that OLC engaged in some deliberation, full stop. It would not necessarily reveal the *content* any deliberations—any details about the agency's "give-and-take"—surrounding a decision of whether to rescind a prior opinion. The nonexistence of a responsive record would be similarly uninformative.

9

* * *

The foregoing analysis helps explain why the government does not regularly rely on *Glomar* responses to protect its interests under Exemption 5. The privileges discussed above differ in their specifics but share a common purpose: encouraging free and frank communication within the government. That purpose is a mismatch with the justification for allowing *Glomar* responses: that disclosing the *existence* of certain information is harmful. By contrast, there is a clear alignment of purpose between several other exemptions—namely Exemptions 1, 3, 6, and 7(C)—and the purpose of *Glomar*. Unsurprisingly, these are the exemptions for which the government frequently relies on *Glomar* responses.[3]

In short, the Department has not shown that the very fact of these records' existence is privileged so as to fall within Exemption 5. The Department was therefore not permitted to issue a *Glomar* response to Western Values' requests. As a result, the Court will require the Department to submit "a Vaughn index or other description of the kind of documents the [agency] possesses"—if any—that are responsive to Western Values' requests. ACLU v. CIA, 710 F.3d 422, 432 (D.C. Cir. 2013). The Court need not resolve at this juncture the level of

---

[3] Exemptions 1 and 3 protect sensitive national-security information; the existence or nonexistence of records expose the existence of a secret program or confirm nonexistence of such a program—facts that *themselves* are likely classified. See, e.g., Military Audit Project v. Casey, 656 F.2d 724, 728-731 (D.C. Cir. 1981); see also Exec. Order No. 13,526, § 3.6(c), 3 C.F.R. 298 (2010) (expressly endorsing use of *Glomar* responses to protect classified information). Exemption 6 protects personal identifying information; sometimes a request is so targeted that the existence of responsive records would reveal the sensitive fact of whether a person was under investigation. See, e.g., Beck v. DOJ, 997 F.2d 1489 (D.C. Cir. 1993) (affirming *Glomar* response to request for records regarding misconduct by two DEA agents). Same goes for Exemption 7(C), which protects the investigatory records of law-enforcement agencies. See Roth, 642 F.3d at 1178 ("[M]erely acknowledging that the FBI has information regarding [three individuals] would tend to associate them with criminal activity, thus impinging on their privacy.").

detail necessary to comply with FOIA—or, put differently, how much information about any responsive documents may be properly withheld pursuant to Exemption 5. See id. (finding *Glomar* response inadequate but leaving open "how detailed a disclosure must be made").

    B.  OLC's Search Was Adequate

As part of its request, Western Values sought communications between OLC and John Yoo, Todd Gaziano, Pacific Legal Foundation staff, and American Enterprise Institute staff. Compl. at 4. Western Values now contends that OLC's searches for these records—both its initial search and a second search made during summary-judgment briefing—were inadequate.

To establish that its search for records was adequate under FOIA, the agency "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (citing Weisberg v. DOJ, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). In evaluating the adequacy of a search, the Court may rely on sufficiently detailed affidavits or declarations submitted by the agency that set forth the search terms and the type of search performed. See, e.g., Valencia-Lucena v. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999). Agency FOIA declarations carry "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs. Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation omitted).

In seeking to establish the adequacy of its searches, OLC has filed two declarations from Paul Colborn, an OLC attorney who has supervised the Office's responses to FOIA requests for over 30 years. Colborn Decl. I ¶ 1. In the Court's view, these declarations show "beyond material doubt that [OLC's] search was reasonably calculated to uncover all relevant

documents." Ancient Coin Collectors Guild v. Dep't of State, 641 F.3d 504, 541 (D.C. Cir. 2011) (quoting Valencia-Lucena, 180 F.3d at 325).

In its request, Western Values denoted specific email addresses and domain names for OLC to use in its search for those communications. Id. Mr. Colborn's declarations explain that OLC, "seeking overinclusion," originally determined that eight of OLC's 20–25 attorneys could have potentially had records responsive to this portion of the FOIA request. Colborn Decl. I ¶ 20. DOJ's technical staff then conducted a search of the electronic files and email of those eight attorneys using an eDiscovery tool called "Clearwell." Id. ¶ 21–22. This first search sought any electronic or email communications between January 20, 2017 and August 31, 2017 that contained the terms "yoo" or "gaziano" in any field, as well as any of the specified email addresses or domains in the "to," "from," or "cc" fields of any email communications. Id. ¶ 22. The Office's FOIA Attorney, under Mr. Colborn's supervision, reviewed any potentially responsive emails or electronic files from the search results and located no responsive records. Id. ¶ 23, 24.

In its opposition to the Department's motion for summary judgment, Western Values objected to the adequacy of OLC's first search, citing "the limit of whose records were searched, the failure to search for other electronic records that were not emails, and what records were found but deemed unresponsive." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6. In response to those objections, OLC conducted a second search which encompassed all employees of OLC, including non-attorneys. The employees were asked "if they [had] or were aware of any records meeting the description taken directly from Plaintiff's request" and were advised that "this request includes any agency records (including email, text messages, and hard copy records) regardless of where they are located." Second Decl. of Paul P. Colborn Supp. Def.'s Reply

("Colborn Decl. II") ¶ 4. According to Mr. Colborn, "[n]o OLC employee identified or reported being aware of any such records." Id.

Even still, Western Values contends that the second search was also inadequate because OLC did not describe in detail how the employees actually searched for the responsive records, did not mention searching for non-email communications, and did not explain why certain files that were located were deemed non-responsive. Pl.'s Reply at 7. But none of these alleged deficiencies render the search inadequate. The presumption of good faith given to agency declarations means that, absent evidence to the contrary, any documents deemed non-responsive by a declarant on behalf of OLC are assumed to be so. SafeCard Servs., 926 F.2d at 1200. Mr. Colborn's declarations also adequately explain why he selected the eight attorneys in the initial search and, as for the second search, the format and content of information he sought from other OLC employees beyond those eight attorneys. Colborn Decl. II ¶ 4 (explaining that he asked OLC employees to search for non-email communications, including text messages and hard-copy records).

The Court thus finds that Mr. Colborn's declarations "show beyond material doubt" that OLC's searches were "reasonably calculated to uncover" the communications records requested by Western Values. Ancient Coin Collectors, 641 F.3d at 541. Therefore, the Court will grant the Department's motion for summary judgment with respect to the adequacy of its search for the requested communications.

IV. **Conclusion**

The Court grants in part and denies in part each party's motion for summary judgment. Western Values' motion is granted (and the Department's is denied) with respect to whether the Department was permitted to issue a *Glomar* response. The Department's motion is granted (and

13

Western Values' is denied) with respect to whether the Department's search for the final category of records was adequate. A separate order accompanies this memorandum opinion.

_____  
CHRISTOPHER R. COOPER  
United States District Judge

Date: July 18, 2018